FILED
United States Court of Appeals
Tenth Circuit

April 12, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

CARL CASE,

      Petitioner - Appellee,

v.

TIM HATCH, Warden, Guadalupe
County Correctional Facility,

      Respondent - Appellant.

No. 11-2094
(D.C. No. 1:08-CV-00542-MV-WDS)

---

**ORDER**

---

Before **TYMKOVICH**, **EBEL**, and **HOLMES**, Circuit Judges.

---

This matter is before the court on the appellee's *Petition for Rehearing and Suggestion for Rehearing En Banc*. We also have a response from the appellant. Upon consideration by the judges assigned to this appeal originally, the petition for panel rehearing is granted in part to the extent of the amendments found in the Opinion now attached to this order. The petition for panel rehearing is otherwise denied. The Clerk is directed to vacate the court's original decision and concurrence, and to replace it with the Opinion and concurrence attached to this order.

The petition, response and amended Opinion were also transmitted to all of the judges of the court who are in regular active service. As no member of the panel and no judge in regular active service requested that the court be polled, the request for en banc rehearing is denied.

Entered for the Court

ELISABETH A. SHUMAKER
Clerk of Court

FILED
United States Court of Appeals
Tenth Circuit

April 12, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CARL CASE,

          Petitioner-Appellee,

    v.

TIM HATCH, Warden, Guadalupe
County Correctional Facility,

          Respondent-Appellant.

No. 11-2094

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CIV-08-00542-MV-WDS)**

---

James W. Grayson, Assistant Attorney General (Gary K. King, Attorney General of New Mexico, and Nicole Beder, Assistant Attorney General, with him on the briefs), Office of the Attorney General of New Mexico, Santa Fe, New Mexico, for Respondent-Appellant.

Todd A. Coberly, Coberly Law Office, Santa Fe, New Mexico (Marc M. Lowry, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP, Albuquerque, New Mexico, with him on the brief) for Petitioner-Appellee.

---

Before **TYMKOVICH**, **EBEL**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

In this appeal we consider our gate-keeping role for second or successive habeas petitions under 28 U.S.C. § 2244. We conclude that petitioner Carl Case has not met the

legal requirements for challenging his conviction, and therefore reverse the district court's conditional grant of habeas relief.

This appeal arises from a crime committed over thirty years ago—the rape and murder of a teenager near an isolated dam outside of Carlsbad, New Mexico. Several young men were convicted of the crime, including Case. Those convictions were upheld by the state courts in New Mexico both on direct and collateral review, and Case's first habeas petition in federal court was denied.

In 2008, Case filed an application for permission to file a second habeas petition in this court. He claimed constitutional error occurred at trial based on the discovery of new and previously undisclosed evidence involving a trial witness, and the recantation of trial testimony by two prosecution witnesses nearly twenty years after the trial.

In this appeal we are required to review what happened at trial. Through that perspective we are satisfied that Case's due process rights were not violated and that he received a fundamentally fair trial. We are also satisfied that the newly discovered evidence he points to does not require a new trial, a point of agreement we have with the New Mexico Supreme Court.

Case cannot therefore satisfy the requirements of § 2244(b)(2)(B) that he "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Because of that, his application for permission to file a second or successive habeas petition must be denied.

2

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we VACATE the district court's conditional grant of habeas relief and remand for the court to DISMISS for lack of jurisdiction.

## I.  Background

On January 30, 1982, the body of Nancy Mitchell, a local teenager, was discovered in Eddy County, New Mexico, near an area known locally as Six Mile Dam, just outside of Carlsbad, New Mexico.  The medical evidence at trial indicated she died of exposure and had been dead for several weeks prior to the discovery of her body.  She had bruises on her upper body and a fractured skull.

Mitchell ran away from her Carlsbad home in early December 1981, staying with friends and occasionally in motels in Carlsbad.  Throughout the month of December there were a number of sightings of Mitchell around town, but the last uncontested sighting took place on December 21.  On December 21, Mitchell was seen at Ricky and Mary Worley's apartment; they were trying to convince Mitchell that she should return home to her parents, and they believed she was planning to do so later that evening.  Mitchell eventually left the apartment with Bobby Autry, who drove around with her for some time until he dropped her off at a Dairy Queen in Carlsbad.

Although some of the events after December 21 are disputed, Case testified at trial that he was at Six Mile Dam with four other young men and Mitchell on New Year's Day 1982.  While there, he said, several of the men attacked Mitchell, attempting to engage in sexual intercourse with her, but she resisted and the attack eventually ceased.  Case

3

further testified that Mitchell walked onto the dam a few minutes later to go to the bathroom, where she fell and rolled down the side. When she did not reemerge from the bushes and underbrush at the dam's base, Case and his friends left and drove back to town.

Mitchell's body was discovered four weeks later, on January 30, 1982. A police investigation resulted in the arrest of six young men, including Case, for the rape and murder of Mitchell.

### A. Pre-Trial Statements and Trial Testimony

At Case's trial, three local teenagers—Audrey Knight, Bobby Autry, and Paul Dunlap—testified they had seen Mitchell with Case and a group of local young men on the night of January 1, 1982. While other witnesses testified they had seen Mitchell before and after this date, at the time of trial, the majority of evidence indicated that she was present at Six Mile Dam on New Year's Day with a group that included Case.

During the course of the initial investigation and at trial, the three eyewitnesses told inconsistent stories, but all three stated that Case was present at Six Mile Dam and participated in a physical attack and sexual assault on Mitchell. The inconsistent stories were explored at trial during both direct and cross examinations.

#### 1. Audrey Knight

Audrey Knight was a friend of several of the men implicated in the attack. Knight gave two statements to the police implicating six men in Mitchell's death. Her initial statements and her trial testimony varied slightly, but the essence of her testimony was

4

that, at a party the night of January 1, she heard Curtis Worley, Carl Case, Mike Tweedy, Joe Brown, Paul Dunlap, and Randy Davis talk about "gang banging" Mitchell. R., Vol. IV, Doc. 9, Trial Transcript at 819. Shortly thereafter, she saw the six men and Mitchell leave the party in Worley's car. Knight, concerned for Mitchell's safety, left the party about fifteen minutes later in her truck, in an attempt to find the group. She saw Worley's car parked near Six Mile Dam and pulled up to it. When she stopped, she saw Mitchell with her shirt off, pinned across the seat of the car by Mike Tweedy. Case then walked up to Knight's truck and told her to leave. Knight said that Mitchell saw her and called out for Knight's help, but Knight left and spent the rest of the evening by herself.

The next day, she heard Case and Worley talking about stabbing and raping Mitchell. She denied seeing Autry leave the party with the other six men, and denied seeing him at the scene of the rape. Knight also said that she had received anonymous phone calls threatening her if she told anyone what she had seen. She believed these calls came from Case.

### 2. Bobby Autry

Bobby Autry was an 18-year old friend of Mitchell and several of the men implicated in the attack. Autry was interviewed by police four times—January 30, February 3, March 5, and March 12, 1982.[1] The crux of Case's claim of undisclosed

---

[1] We deny all motions by both parties to supplement the record on appeal, with the exception that we grant the state's request to include exhibit 29, a tape-recorded version of Autry's March 5, 1982 interview. This exhibit corrects an error in the transcript prepared for the record, which left out an important word. This appears to be a scrivener's error.

evidence discussed below concerns the February 3 interview. Although each of the interviews was tape recorded, Case argues that at the time of trial, only three of the interviews had been transcribed, and the February 3 interview had not been. In the interviews, Autry originally denied having any knowledge of the crime, and denied ever having any sexual encounters with Mitchell. But in his February 3 statement, he admitted that he and Mitchell had gotten undressed in his car on December 19, and that he had partially penetrated her before she pushed him away. Autry told the police that he lied initially because he was unsure whether Mitchell had been raped, but if she had been, he did not want to be implicated. In both his January 30 and February 3 statements, Autry stated that the last time he saw Mitchell was when he dropped her off at the Dairy Queen in Carlsbad on December 21. In his March 5 statement, Autry stated that he might have seen Mitchell in town a few days later, but was unsure. On March 12, Autry took and failed a polygraph examination. After receiving the results and consulting with his father, Autry agreed to give a truthful statement in exchange for immunity.

Autry's final statement, on March 12, was that he was in town on January 1 when Curtis Worley picked him up in his car. Also in the car were Case, Mitchell, Tweedy, Brown, and Dunlap. After driving around town, they drove to Six Mile Dam to drink beer. Autry denied that they went to a party before arriving at the dam. Once at the dam, Worley hit Mitchell with his fist, knocked her to the ground, and tore her pants open. Autry did not see anyone remove Mitchell's shirt. Someone else, possibly Brown, hit Mitchell in the back of the head with a stick or pipe. At this point, Autry ran away, but

6

heard Mitchell yelling for help and saw the others on top of her. Autry did not see anyone else arrive at the scene, including Knight, but did see the others attacking Mitchell on the ground and then putting her back into the car. Autry also stated that he received threatening phone calls telling him not to discuss what he had seen.

### 3. Paul Dunlap

Paul Dunlap was initially accused of attacking Mitchell at the dam. Dunlap, who was 17 years old at the time, was arrested in March 1982 for the rape and murder of Mitchell, and the prosecution moved to try him as an adult. The motion was denied and the state appealed the decision. After six months in jail, and on the day before the appeals court issued its opinion affirming the denial of the motion, Dunlap accepted the state's offer of complete immunity in exchange for his testimony against Case and the others charged with raping and murdering Mitchell. Dunlap told police that he attended a party near Six Mile Dam on the night of January 1, 1982. He had received a ride to the party and, when he saw Curtis Worley leaving, he asked for a ride back into town. Dunlap stated that Brown, Autry, Worley, Mitchell, and Case were in Worley's car; he stated that Tweedy was not in the car and was not at the scene of the crime.

Dunlap said that the car stopped somewhere near Six Mile Dam and, immediately upon stopping the car, Worley grabbed Mitchell out of the car and slapped her to the ground. At that point, Brown and Case attacked Mitchell, ripping Mitchell's shirt off. The group saw headlights coming up the road, later determined to be from Knight's truck, and they put Mitchell back into the car. Dunlap stated that he had gotten back into the car

7

once the attack began, but that when Knight arrived, he and Case went to speak with her. Dunlap stated that he never heard Mitchell call to Knight for help, and that while Knight was present, Mitchell was in the car with her shirt off, but was still wearing her pants. After Knight left, Dunlap got back into the car and did not participate in the attack on Mitchell. He also testified that he had been threatened by the others to not tell anyone what had occurred.

### 4. Additional Evidence

In addition to the eyewitness testimony, the state presented evidence detailing the physical condition of Mitchell's body when it was recovered. Mitchell's clothing was "disarranged," with her shirt inside out, her pants sitting below her hips, unsnapped and with a broken zipper, and both pockets were pulled out. Trial Tr. at 642. Her body was in a state of moderate to severe decomposition; any injuries to the genital area were undetectable because the organs were "semifluid" from exposure to the elements. *Id.* at 719. The autopsy revealed numerous contusions to the head, neck, and upper chest, deep hemorrhages on the face, and a fracture at the base of the skull, sufficient to produce unconsciousness or death. The body also had injuries consistent with dragging inflicted while she was dying or after death. The ultimate cause of death was exposure to the elements.

### 5. Case's Defense at Trial

Case initially denied any involvement with Mitchell's death, and directed his attorney to prepare an alibi defense. But just before trial, Case's attorney informed him

8

that there was very little evidence to support an alibi defense, so Case chose to testify at trial in his own defense. Case admitted that he gave conflicting pre-trial statements to the police because he "didn't want to get involved," and did not want to potentially ruin his "good reputation." *Id.* at 1375.

Case testified he had been present at the dam with Worley, Brown, Dunlap, Tweedy, and Mitchell, but that no rape had occurred, and no physical assault occurred other than Worley striking Mitchell one time. Case testified that Autry was not at the dam at any time that evening, but he admitted seeing Knight and telling her to leave. Case stated he wanted no part of Worley's fight with Mitchell. At some point after Worley struck Mitchell, Mitchell stated that she had to go to the bathroom and walked out onto the dam. At that point, according to Case, Mitchell fell down the hill she was standing on and tumbled into the weeds and grass below, where he lost sight of her. Case stated it was not a particularly hard fall, but she did not get up. Worley called out to Mitchell one time, but when she did not respond, the men left and drove back into town. According to Case, he left with Worley because Worley "was out of his head," and Worley wanted Mitchell to "walk back to town because she [had] made a fool out of him." *Id.* at 1395. Case's theory was that Mitchell hit her head during the fall, ultimately leading to her death.

Case also presented character witnesses, who testified that he was a "nice" and "pretty decent kind of guy," who was liked by "[a] lot of girls" who "thought a lot of him." *Id.* at 1155, 1157, 1171. He also presented testimony from two individuals who

9

stated that they saw Mitchell several weeks after January 1, implying that the medical examiner's date of death estimation was incorrect. But during the rebuttal, the state's expert testified that he could "absolutely exclude" the possibility that Mitchell was alive at that time. *Id.* at 1482–83.

Case was convicted by a jury on October 26, 1982 of first-degree murder and first-degree criminal sexual penetration, and sentenced to life imprisonment plus eighteen years.

### B. Post-Trial Activities and First Habeas

The New Mexico Supreme Court affirmed Case's convictions on direct appeal. *State v. Case*, 676 P.2d 241 (N.M. 1984) (*Case I*). Case then filed a habeas petition in federal court pursuant to 28 U.S.C. § 2254. The district court entered an order conditionally granting the petition on the grounds that the trial court abused its discretion by refusing to declare a mistrial or *voir dire* jurors following an allegation of juror misconduct. The state appealed, and we remanded for an evidentiary hearing. On remand, the district court again conditionally granted Case's petition on the jury misconduct claim, but denied relief on a separate denial-of-continuance claim. We affirmed the district court's denial of relief on the denial-of-continuance claim, but reversed, thereby denying relief, on the jury misconduct claim. *Case v. Mondragon*, 887 F.2d 1388 (10th Cir. 1989) (*Case II*).

### C. Alleged Brady Violation and Subsequent State Proceedings

In 2004, Case filed a petition for a writ of habeas corpus in state district court, after

10

two of the three eyewitnesses, Knight and Dunlap, signed affidavits recanting their trial testimony. While the petition was pending, Case's investigators discovered an audio tape in the government's case file, which contained an untranscribed, pre-trial statement by Autry, made on February 3, 1982. Case then supplemented his petition with a *Brady* claim, arguing that, if it had been available at trial, the February 3 statement would have undermined Autry's credibility and could have ultimately implicated Autry in the crime. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). While the petition was pending, Case also had additional DNA testing done. The DNA testing could detect no male DNA or sperm cells in the evidence taken from Mitchell's body and clothing.

On November 29–30, 2005, and February 9, 2006, the state district court held evidentiary hearings on Case's petition. Extensive testimony was heard from a number of witnesses, including the two recanting witnesses, Case's trial counsel, the trial prosecutor, and Case himself.

### 1. Witness Recantations

Knight and Dunlap both recanted their testimony in open court during the hearings.

Knight testified she had lied at trial, she was never at Six Mile Dam that evening, and she did not know anything about the events leading up to Mitchell's death. She

11

explained she felt pressured by police because they interviewed her on multiple occasions and told her they had information about her truck at the scene. She stated that once Case changed his story and admitted to being at Six Mile Dam, she changed her story as well and provided a fabricated story to the police.[2]

Dunlap testified that, while he was in custody on murder and rape charges, he initially told police he did not have any knowledge about the events leading up to Mitchell's death. He was then given a polygraph test and told by police he failed the test. He claims that, once he realized other witnesses were lying, he decided to fabricate a story, hoping to strike a deal with the prosecution. He scripted his testimony from

---

[2] A friend of Knight's who saw Mitchell on New Year's Eve testified at trial:

> Q: [D]id Audrey Knight ever talk to you about what happened to Nancy Mitchell?
> A: Yes.
> Q: When did she talk to you about that?
> A: Just–I guess it was right after it was in the paper she told me.
> Q: What did she tell you about it?
> A: Well, she just said that she knew who did it, and she was out there because she followed, I guess it was, Curtis' car out there. And she just told me that what they did to her.
> Q: All right. Do you know if Miss Knight had gone and talked to the police before she talked to you?
> A: No, she didn't.
> Q: What did you tell her to do after she told you this story?
> A: I told her if it was the truth, to go tell the police.

Testimony of Mary Sue Tate, R., Trial Transcript at 1523–24.

information he had learned at his bail hearing and from police questioning. Once he memorized the script, he destroyed it and notified the district attorney he would testify truthfully in exchange for an offer of immunity. Dunlap stated he was never told to lie, and he never informed anyone that he was lying, but the entirety of his testimony was a fabrication.

### 2. Autry's February 3 Statement

With respect to the February 3 statement by Autry, an investigator testified that, while reviewing the state's files, he found a taped interrogation of Autry of which he was unfamiliar and that had, to his knowledge, not been a part of the trial record.

In the February 3 statement, Autry admitted that in mid-December 1981, he had "fooled around" with Mitchell and attempted to have intercourse with her. R., Vol. IV, BA, February 3 Stmt. at 11. Specifically, Autry stated, "I got fixed up about half way in, and she said no, she pushed back, and I said alright." *Id.* Admitting that his penis went partially into her vagina, but that he did not ejaculate, Autry went on to say that "she pushed me back—she shoved me back when I tried to make out with her . . . . She got mad, said let's go to the party." *Id.* at 11–12. The detective asked Autry to explain the discrepancy between his story and his answer to a prior question asking whether he had previously had intercourse with Mitchell. Autry explained that at the time, he did not know if Mitchell had been raped and he did not want anyone to "point the finger at me cause I didn't do it." *Id.* at 15. Autry then explained that, in any event, he did not consider this an act of intercourse because "I barely got in and she just pushed me back."

13

*Id.* at 16. While he admitted to being "mad . . . but not, not that mad," he stated that it was "no great big loss to get turned down by a girl." *Id.*

Case's trial counsel, Gary Mitchell, testified that he is "convinced [he] didn't have [the Autry tape]." Ev. Hear. Tr. at 259. "Because if [he] had it, [he] would have cross-examined differently and [he] would have used it . . . . [because] the big thing in this case for [him] . . . was trying to find somebody that did this other than [Case]." *Id.* at 259–60. He classified himself as "young" and "aggressive" during this time period, and concluded that "if I had that information" and did not use it, "I was incompetent . . . . I would have used it. I would have hit him over the head with it, if I had had it." *Id.* at 259, 261.

The prosecutor, James Klipstine, testified that he did not have any specific recollection of having disclosed the February 3 statement to the defense, but that he was familiar with the substance of the interview. Admittedly, he was unable to say whether his knowledge of the subject matter "came from this interview or other conversations with the witness or where it [had] c[o]me from," but he had knowledge of the "facts that are set out" in the statement. *Id.* at 334.

Case testified his testimony was a fabrication, that he "wasn't at Six Mile Dam and [that he] didn't hurt anybody." *Id.* at 240. But unfortunately his attorney had been unable to develop an alibi defense based on the names of the non-cooperating witnesses that Case had supplied, so he fabricated a story based on "what everybody was saying" in the state's case at trial and tried to mimic their testimony to his advantage. *Id.* at 245–46.

Ultimately, the state district court denied the petition, finding that the "State did

14

not illegally suppress evidence that was materially favorable to" Case, and that the "recantations of Paul Dunlap and Audrey Knight do not constitute newly discovered evidence." *See* R., Vol. I at 16.

Case was granted certiorari review by the New Mexico Supreme Court. The court denied relief in a written opinion. *Case v. Hatch*, 183 P.3d 905 (N.M. 2008) (*Case III*). The court found Knight's and Dunlap's recanted testimony was cumulative evidence, on the basis that their inconsistent stories were previously before the jury and at this point, they were attempting to "revert to the original statements they gave to the police that they did not know anything about the events leading to Mitchell's death." *Id.* at 917. The court also found that "Case was aware of these [inconsistent] statements, as evidenced by cross-examination of each witness at trial. The defense strategy . . . was that the witnesses were pressured by the police; they were scared of the police; and therefore they conformed their testimony in such a way as to incriminate Case and others." *Id.* "Despite inconsistencies in the details, each witness incriminated Case. Case himself testified about his presence and that of Knight and Dunlap. Although he attempted to minimize what had happened to Mitchell, he did confirm that Worley had struck her and had removed her shirt." *Id.*

With respect to Autry's February 3 statement, the court found there was no suppression of materially favorable evidence in violation of *Brady*. The *Brady* claim failed for lack of materiality because Autry's "credibility was already put into question at the trial, not only through an aggressive cross-examination showing prior inconsistent

15

statements, but through character witnesses who testified that Autry had a reputation for untruthfulness." *Id.* at 919–20. Thus, the tape would have been cumulative impeachment evidence, and was not material for *Brady* purposes.

### D. Second Federal Habeas

Case then sought permission from this court to file a second habeas petition in federal court pursuant to the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244(b)(3)(A), which requires this court to authorize a second or successive application for habeas relief before the district court may consider the application. We concluded Case had made a prima facie case showing that the February 3 Autry statement qualified as "newly-discovered evidence under 28 U.S.C. § 2244(b)(2)(B)(i)" and that Case had sufficiently alleged constitutional *Brady* error. R., Vol. I at 66. We left open the question of whether this evidence was material.[3]

Once authorized to receive the petition, the magistrate judge below concluded that Case failed to "establish by clear and convincing evidence that, but for constitutional error, even when taking into consideration the recantations, no reasonable factfinder would have found [Case] guilty." R., Vol. I at 575. Accordingly, the magistrate judge recommended the petition be dismissed.

---

[3] The order of authorization was an unsigned order entered by the Clerk of this court and is not a published decision of this court. Therefore, it has no precedential value, but the panel will consider its persuasive value in line with 10th Circuit Rule 32.1. In any event, given our de novo standard of review, we have reviewed the entirety of the record in this case and any conclusions we reach are independent of our prior authorization.

After receiving this recommendation, the district court instead chose to hold an additional evidentiary hearing to determine whether Knight's and Dunlap's recantations were credible, an issue not reached in *Case III*. The district court found the recantations credible, determined that constitutional *Brady* error occurred at Case's trial, and, reviewing the evidence as a whole, ruled that Case satisfied the procedural hurdle erected by 28 U.S.C. § 2244(b)(2)(B).

Once the district court concluded Case satisfied the "gate-keeping" requirements of § 2244, the court reviewed the merits of Case's *Brady* claim de novo, finding the state court decision, *Case III*, contravened clearly established federal law. The district court found the state court failed to holistically evaluate the impact of the suppressed evidence and improperly used an abuse of discretion standard when evaluating Case's *Brady* claim. Applying AEDPA deference, the court also determined that *Case III* unreasonably applied *Brady* law by holding the Autry interrogation was cumulative impeachment evidence and Case could not have used the evidence to present an alternate defense theory. The district court granted Case a conditional writ of habeas corpus. *Case v. Hatch*, 773 F. Supp. 2d 1070 (D.N.M. 2011) (*Case IV*).

## II. Discussion

The filing of a second or successive § 2254 application is tightly constrained by the provisions of AEDPA. Congress expressly established a two-step "gate-keeping" mechanism for the consideration of second or successive habeas corpus applications in federal courts. Before a court can consider a second claim, an applicant must first "move

17

in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). The court of appeals then has 30 days to decide whether to grant the authorization to file. *Id.* § 2244(b)(3)(D).

If the court of appeals finds the applicant "makes a prima facie showing that the application satisfies the requirements of [§ 2244(b)]," *id.* § 2244(b)(3)(C), the applicant may pursue a claim in district court. The district court must then review the proffered evidence, and "shall dismiss any claim . . . that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of [§ 2244(b)]." *Id.* § 2244(b)(4).

Section 2244's gate-keeping requirements are jurisdictional in nature, and must be considered prior to the merits of a § 2254 petition. *Panetti v. Quarterman*, 551 U.S. 930, 942–47 (2007). Jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation omitted). In other words, a rule is jurisdictional when "it governs a court's adjudicatory capacity." *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011). Claim-processing rules, by contrast, "promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Id.* at 1203.

Section 2244(b) provides that a successive habeas corpus application "shall be dismissed" unless the gate-keeping requirements are met and clearly speaks to the power of the court to entertain the application, rather than any procedural obligation of the

18

parties. This statutory language mandating dismissal also sets forth a "threshold limitation on [the] statute's scope," providing further indication that the gate-keeping requirements are jurisdictional rules, not mere claim-processing rules. *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006)).

Additionally, one purpose of AEDPA is to enforce Congress's preference for a state's interest in finality of judgment over a prisoner's interest in additional review. *See Calderon v. Thompson*, 523 U.S. 538, 557 (1998). "This purpose suggests that the elements of § 2244(b)(2)(B) must be resolved prior to, and independently of, consideration of the similar elements of a *Brady* claim." *Johnson v. Dretke*, 442 F.3d 901, 909 (5th Cir. 2006). All of these considerations are equally applicable at each of § 2244's gates. *See Goldblum v. Klem*, 510 F.3d 204, 217 (3d Cir. 2007) ("We have made it clear that unless *both* the procedural and substantive requirements of § 2244 are met, the District Court lacks authority to consider the merits of the petition.") (emphasis added) (citation and quote omitted).

Accordingly, we must first determine whether Case satisfies the requirements of § 2244(b)(2)(B), and our review owes no deference to the rulings of the state courts.

### A. *First Gate—Court of Appeals*

Reviewing the statutory scheme as a whole is helpful, even though Case already received authorization from this court to proceed in the district court. As described above, § 2244 requires an applicant to pass through two gates. The first gate requires the

19

petitioner make a *prima facie* showing at the circuit level that no reasonable factfinder

would have found him guilty but for constitutional error at trial. The second gate requires

the petitioner to back up the prima facie showing at the district court level with actual

evidence to show he can meet this standard.

In particular, § 2244(b)(2) provides:

> A claim . . . not presented in a prior application shall be
> dismissed unless
>
> (B)(i) the factual predicate for the claim could not have been
> discovered previously through the exercise of due diligence;
> and
>
> (ii) the facts underlying the claim, if proven and viewed in
> light of the evidence as a whole, would be sufficient to
> establish by clear and convincing evidence that, but for
> constitutional error, no reasonable factfinder would have
> found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2).

A three-judge panel of this court concluded Case satisfied his burden at the first

gate by making a prima facie showing he could meet the requirements of

§ 2244, and, thus, authorized him to file in district court a second or successive

application. *See* R., Vol. I at 71; 28 U.S.C. § 2244(b)(3)(A). Again, we concluded Case

made a prima facie showing that the February 3 Autry statement qualified as "newly-

discovered evidence under 28 U.S.C. § 2244(b)(2)(B)(i)" and Case had sufficiently

alleged constitutional *Brady* error. R., Vol. I at 66. We left open the question of whether

this evidence was material.

20

But this was only a "preliminary determination," *id.* at 70, demonstrating "possible merit to warrant a fuller exploration by the district court." *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997). It is important to note that our prima facie finding was *not* a "preliminary merits assessment," but rather a determination focused "solely on the conditions specified in § 2244(b) that justify raising a new habeas claim . . . *not to any assessment regarding the strength of the petitioner's case*." *Ochoa v. Sirmons*, 485 F.3d 538, 541–42 (10th Cir. 2007) (emphasis added). This authorization was made under the limited statutory deadline—within 30 days after the filing of the motion—and we concluded that we were "not in a position to fully evaluate the strength of Mr. Case's claim." R., Vol. I at 69.

> The distribution of judicial responsibility reflected in the plain language of the statute—by which the appellate court makes an expedited assessment of whether a new habeas claim falls within a formally defined category and, if it does, then leaves the adjudication of that claim to the district court in the first instance—is clearly in keeping with the respective roles of appellate and trial courts in our system.

*Ochoa*, 485 F.3d at 542.

As discussed above, a previous panel determined Case made a prima facie showing that he could satisfy the gate-keeping requirements of § 2244. But we have never decided the exact contours and effect of this determination, though many of the other circuits have.

The most widely-adopted analysis is from the Seventh Circuit's decision in *Bennett*, where the court explained the limited scope of a prima facie showing:

By "prima facie showing" we understand (without guidance in the statutory language or history or case law) simply a sufficient showing of possible merit to warrant a fuller exploration by the district court. All that we usually have before us in ruling on such an application, which we must do under a tight deadline (*see* 28 U.S.C. § 2244(b)(3)(D)), is the application itself and documents required to be attached to it, consisting of the previous motions and opinions in the case. We do not usually have a response from the government, though such a response is authorized. . . . If in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition, we shall grant the application.

119 F.3d at 469–70. But the court went on to explain the district court must

not defer to that preliminary determination:

The grant is, however, it is important to note, tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion. 28 U.S.C. § 2244(b)(4). *The movant must get through two gates before the merits of the motion can be considered.*

*Id.* at 470 (emphasis added). Thus, *gate one* is at the circuit court level where a

preliminary assessment occurs based on the application; *gate two* is at the district court

level where a record is made and a final assessment occurs.

At least eight other circuit courts have adopted this interpretation. *See Goldblum

v. Klem*, 510 F.3d 204, 219 (3d Cir. 2007); *In re Lott*, 366 F.3d 431, 432–33 (6th Cir.

2004); *In re Williams*, 330 F.3d 277, 281–82 (4th Cir. 2003); *In re Holladay*, 331 F.3d

1169, 1173–74 (11th Cir. 2003); *Bell v. United States*, 296 F.3d 127, 128 (2d Cir. 2002);

22

*Reyes-Requena v. United States*, 243 F.3d 893, 898–99 (5th Cir. 2001); *Thompson v.*

*Calderon*, 151 F.3d 918, 925 (9th Cir. 1998); *Rodriguez v. Superintendent, Bay State*

*Corr. Ctr.*, 139 F.3d 270, 273 (1st Cir. 1998), *abrogated on other grounds by Bousley v.*

*United States,* 523 U.S. 614 (1998).

We have referenced this standard in dicta, *Ochoa*, 485 F.3d at 542 n.4, but never

formally adopted it ourselves. We join the other circuits in adopting *Bennett's*

understanding of what is required to make a "prima facie showing."[4] This adoption is

important because it clarifies our position with respect to the authorization we previously

gave to Case, allowing him to file his successive petition in the district court. As §

2244(b)(3) states: only after the appropriate court of appeals has granted an order

authorizing the district court to consider the application will the district court be able to

proceed. If we had denied Case's request for authorization, then the matter would have

ended. *See id.* § 2244(b)(3)(E) (stating that the denial of authorization is not subject to a

petition for rehearing or for a writ of certiorari).

But since we granted authorization, it is important to note that we were merely

making an initial gate-keeping ruling, and that the district court was still required to

determine, at the second gate, whether Case had met § 2244's jurisdictional requirements.

If either the district court, or this court—reviewing the district court's determination de

---

[4] We are careful to observe that adopting this standard does not modify our cautionary statement in *Ochoa*, where we noted that the phrase "possible merit to warrant a fuller exploration by the district court" does *not* refer to the underlying constitutional claim but to the petitioner's showing on the statutory requirements the district court will consider at the second gate. *See* 485 F.3d at 542 n.4.

23

novo—finds that Case's petition fails at this second gate, his petition will be dismissed. *See* 28 U.S.C. § 2244(b)(4); *see also In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (*per curiam*) (explaining that authorization is "tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion"); *id.* (Higginbotham, J., concurring) ("It is difficult to make informed judgments without the development of the facts [of this particular case] in some form of hearing. While skeptical of [the applicant's] ability to do so . . . I will not dissent from an order allowing the district court to make a more informed judgment than is available to us, as a second gate to leave to file a successive writ.").

In sum, once a petitioner makes a prima facie showing, he still must pass through the second gate erected by § 2244. At that stage, the district court must determine whether the petition did, in fact, satisfy the requirements of § 2244(b). *See LaFevers v. Gibson*, 238 F.3d 1263, 1265 (10th Cir. 2001); *Bennett*, 119 F.3d at 470 ("The movant must get through two gates before the merits of the motion can be considered."). *See also* 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim . . . that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirement of [§ 2244]."). In this case, after our authorization at the prima facie stage, the district court found Case had successfully made the required showing at § 2244's second gate, *Case IV*, 773 F. Supp. 2d at 1093, and subsequently—reaching the merits—found Case was entitled to habeas relief under § 2254.

24

We review the district court's determinations de novo. *Ochoa v. Workman*, 669 F.3d 1130, 1141 (10th Cir.), *cert. denied*, 2012 WL 2931319 (U.S. Oct. 1, 2012) (quoting *LaFevers*, 238 F.3d at 1266). Thus, we turn to the district court's second-gate analysis.

## B. Second Gate—District Court

To pass through the second jurisdictional gate, Case is required to show two things. One is that "the factual predicate for [his *Brady*] claim could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). Case is then required to show "the facts underlying the [*Brady*] claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id*. § 2244(b)(2)(B)(ii).

Case's *Brady* claim is premised on the contention that the state wrongfully failed to provide Autry's February 3 statement to the defense prior to trial. As mentioned above, Autry gave four taped statements to the police—on January 30, February 3, March 5, and March 12. The February 3 statement may not have been transcribed and the record is disputed as to whether the audio tape was itself in the government's file prior to trial. Although the New Mexico state courts found no reason to believe the tape or transcript had been suppressed, no one questions that the other three statements were transcribed and provided to Case's counsel for use at trial. In June 2005, the February 3 statement was discovered on a cassette tape by several student investigators, working as a part of

25

Case's legal team. The tape had an interview of Autry on one side and an interview of another witness, Joe Brown, on the other side. Ev. Hear. Tr. at 36–37.

At the state evidentiary hearing, it was established the routine practice for handling tapes after interviews at the time was that the tapes were turned over to stenographers and were then transcribed. Once transcribed, the statement was provided to the prosecutor, who maintained an "open file" policy with defense counsel. No transcript of the recording was ever found in the files of the prosecutor, police department, or defense counsel. And even though Autry testified in several trials arising from Mitchell's death, the February 3 statement does not appear to have been produced or used to cross-examine him in the other trials.

Additionally, Case's trial counsel testified that, having reviewed the substance of the tape, he did not believe that he received either the tape or a transcription of the statement. He stated this confidently because "had this particular statement been available to him, he would have used it to cross-examine Autry because it showed that (1) Autry had previously had a sexual relationship with Mitchell, and (2) he was angry because he was unable to complete the sexual encounter." *Case III*, 183 P.3d at 918.

But much of the substance, if not the details, of Autry's February 3 statement can be seen in his March 5 statement—which *was* produced prior to trial. In the March 5 statement, Autry told police that he had "tried making out with [Mitchell]," "[g]ot her clothes [off] and we were drunk," and he was then asked, "Is this when you tried to have . . . make love . . . or have sexual intercourse with her, after that you took her home." R.,

26

Vol. IV, BA, March 5 Stmt. at 3, 6. During the trial, the prosecutor asked Autry if he had ever had sexual intercourse with Mitchell and Autry responded that he had not, but that he had tried. Case's counsel did not delve into this line of questioning on cross-examination.

### 1. 28 U.S.C. § 2244(b)(2)(B)(i)—Due Diligence

In determining whether the factual predicate for the *Brady* claim could not have been discovered previously through the exercise of due diligence, 28 U.S.C. § 2244(b)(2)(B)(i), the magistrate judge found the failure of defense to independently listen to all of the audio tapes after receiving transcripts was not fatal. He found it reasonable for defense counsel to assume the transcripts reflected all recorded interviews given the transcription procedures in place at the time.

The district court agreed and further concluded that "the [Autry] statement was [in fact] suppressed, based on the overwhelming evidence in this case." R., Vol. I at 786. The evidence the district court relied on included (1) the fact that neither party discovered a transcript of the February 3 interview, and (2) transcripts from the trials of Case's co-defendants demonstrated that none of their defense attorneys raised these statements in those trials, which the district court found "all but definitively demonstrate that no defense attorney had access to the tape." *Id.*

While the state urges us to find a lack of due diligence, we need not do so here. Since the requirements of § 2244(b)(2)(B) are "conjunctive," and if Case fails at either step, we will dismiss his petition. We choose to focus our analysis on subparagraph (B)(ii), rather than drawing a conclusion on subparagraph (B)(i). *See Spitznas v. Boone*,

27

464 F.3d 1213, 1226 (10th Cir. 2006).

### 2. 28 U.S.C. § 2244(b)(2)(B)(ii)—Constitutional Error

We now turn to the second requirement necessary to file a second or successive application under AEDPA, embodied in § 2244(b)(2)(B)(ii), and conclude that Case did not satisfy its stringent standard.

Case is required to show the "facts underlying the [suppressed *Brady* evidence], if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(B)(ii). This standard has been described as a "strict form of 'innocence,' . . . roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley*." 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice & Procedure* § 28.3[e], at 1628–29 (6th ed. 2011) (citing *Sawyer v. Whitley*, 505 U.S. 333 (1992)).

The New Mexico courts rejected the merits of Case's *Brady* claim. *See Case III*, 183 P.3d at 920. Ordinarily, when considering the merits of a state prisoner's claim for federal habeas relief, a federal court will defer to a state court's adjudication of the merits of that claim. *See* 28 U.S.C. § 2254(d). But, as discussed above, at this step in the gate-keeping analysis, we will review de novo the district court's conclusions under the standards of § 2244. *See LaFevers*, 238 F.3d at 1266.

We now turn to the additional requirements of § 2244(b)(2)(B)(ii).

28

### a. *"But for Constitutional Error"*

At the second gate, an applicant is required to tie his newly proffered facts to the claimed constitutional violation. The applicant need not show whether there was in fact an error, only that "but for" the alleged constitutional error, the applicant would not have been found guilty. This is not a merits inquiry. That inquiry is reserved for *after* the applicant has passed through the second gate. Instead, the applicant must show a linkage between the alleged constitutional error and the new facts of innocence. As we said in *Ochoa v. Sirmons*, the "innocence component in § 2244(b)(2)(B) imposes a merits-type condition" to our analysis "though even this does not directly concern the merit of the constitutional claim itself but rather the extent to which its predicate facts undercut the jury's finding of guilt." 485 F.3d at 542 n.4.

Other circuits have voiced support for this view—namely that it would be placing the metaphorical cart before the horse to require that the petitioner demonstrate a constitutional violation, when that inquiry is reserved for a determination on the merits. *See, e.g.*, *In re Swearingen*, 556 F.3d 344, 347 (5th Cir. 2009) ("[B]efore addressing the merits of the successive petition, the district court must independently determine whether the petition actually satisfies the stringent § 2244(b)(2) requirements."); *Benchoff v. Colleran*, 404 F.3d 812, 816 (3d Cir. 2005) ("Unless both the procedural and substantive requirements of § 2244 are met, the District Court lacks authority to consider the merits of the petition."); *In re Williams*, 330 F.3d 277, 281–82 (4th Cir. 2003) ("[T]he § 2244(b) inquiry must be resolved before the district court may consider the merits of a claim

29

within a successive application.").

We review the gate-keeping analysis de novo, but when we reach the merits, we will apply the deferential standards of § 2254 in determining whether an actual constitutional violation occurred. To require a full showing at this stage would collapse the § 2254 inquiry into § 2244, making § 2244 redundant. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (noting canon of construction that statutes should be read to avoid making any provision "superfluous, void, or insignificant").

In sum, subparagraph (B)(ii) requires the applicant to identify a constitutional violation and show that he would not have been found guilty "but for" the violation. Here, Case has successfully identified a *Brady* violation, so we must determine whether the newly discovered evidence, based on the record as a whole, would lead every reasonable juror to a conclusion of "not guilty."

### b. *"Evidence as a Whole"*

Before evaluating the newly identified evidence, an initial consideration is the universe of evidence we can consider in evaluating the claim.

Two possibilities are presented: *first*, whether we consider only evidence presented at the time of trial, adjusted for evidence that would have been admitted or excluded "but for constitutional error," or, *second*, whether we also consider newly developed facts that only became available after trial and that are *not* linked to constitutional errors occurring during trial. *See* 28 U.S.C. § 2244(b)(2)(B); *see also Nooner v. Hobbs*, 689 F.3d 921, 933 (8th Cir. 2012). We conclude that the § 2244(b)(2)(B)(ii) inquiry is *only* concerned with

30

the evidence presented at trial, properly adjusted for evidence that Case alleges was erroneously excluded *due to trial-related constitutional error*.

Accordingly, the analysis proceeds in three steps: (1) we start with the body of evidence produced at trial, (2) add "evidence allegedly kept from the jury due to an alleged [constitutional] violation," *Sawyer*, 505 U.S. at 349, and (3) determine whether it is "clear and convincing," "in light of the evidence as a whole," that "no reasonable factfinder would have" convicted Case. 28 U.S.C. § 2244(b)(2)(B)(ii).

The Supreme Court's pre-AEDPA decision in *Sawyer* provides support for this framework. In *Sawyer*, the petitioner claimed that he was "actually innocent of the death penalty," and brought a *Brady* claim in a successive habeas petition. 505 U.S. at 335, 347. He asserted that evidence unconstitutionally kept from the jury established his innocence of one of the aggravating circumstances on which the jury relied in imposing a sentence of death. *Id.* at 347–48. For his *Brady* claim to be considered on the merits, the Court had to "determine if petitioner has shown by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty. . . ." *Id.* at 348.

The Court then went on to consider "the evidence allegedly kept from the jury due to an alleged *Brady* violation." *Id.* at 349.[5] The Court's analysis focused on the probable

---

[5] The Court did not assess whether there had *in fact* been a *Brady* violation, nor even whether the facts *as alleged* amounted to a *Brady* violation. Either of those inquiries would surely have been intertwined with the merits, which had yet to be (and ultimately would not be) reached.

31

effect introduction of this evidence would have had on a reasonable jury—that is, on whether, in light of the other evidence introduced at the sentencing phase, reasonable jurors would have altered their sentencing decision in response to the new, alleged *Brady* evidence. *Id.* at 349–50. Weighing all of the evidence together—the evidence that was before the jury and the alleged *Brady* evidence—the Court concluded that "it cannot be said that no reasonable juror would have found, in light of all the evidence, that petitioner was guilty" of the particular aggravating circumstance that he was contesting. *Id.* at 350. The merits of the *Brady* claim were not considered. *Id.*

Though *Sawyer* predates AEDPA and the enactment of § 2244, the "but for constitutional error" language used in *Sawyer* found its way into subparagraph (B)(ii). Section 2244(b)(2)(B) binds together a successive applicant's claim of actual innocence and his claim of constitutional error—a conclusion reinforced by other language in subparagraphs (B)(i) and (B)(ii) linking "the facts" to the applicant's "claim." *See* 28 U.S.C. § 2244(b)(2)(B)(i) ("the factual predicate for *the claim*"), (B)(ii) ("the facts underlying *the claim*") (emphasis added). Moreover, the Supreme Court hinted at this linkage requirement after the enactment of AEDPA, reading § 2244(b)(2)(B)(ii) to require that "*the facts underlying the [constitutional] claim establish* [a petitioner's] innocence by clear and convincing evidence." *Calderon*, 523 U.S. at 558 (emphasis added). Thus, as a textual matter, subparagraph (B)(ii) excludes the consideration of evidence unconnected to the constitutional error at trial.

Accordingly, we interpret subparagraph (B)(ii)'s "but for" requirement, consistent

with *Sawyer*, as mandating that an applicant "link [his] exculpatory evidence to a specific

constitutional error that prevented the jury from adequately considering the evidence."

*O'Dell v. Netherland*, 95 F.3d 1214, 1246 n.26 (4th Cir. 1996). The alleged

constitutional error must have caused either (1) the wrongful exclusion of evidence that

the applicant was entitled to introduce, or (2) the wrongful admission of evidence that the

petitioner was entitled to exclude. *See McCleskey v. Zant*, 499 U.S. 467, 502 (1991);

*Smith v. Murray*, 477 U.S. 527, 538 (1986). If those requirements are met, a court's task

is then to engage in a counterfactual analysis—viewing the trial evidence as a whole, and

accounting for evidence that the petitioner alleges was erroneously admitted or

excluded—of whether the applicant has shown "by clear and convincing evidence" that

"no reasonable factfinder would have found [him] guilty." 28 U.S.C. § 2244(b)(2)(B)(ii).

Because of the necessary linkage between a petitioner's probable innocence and

the alleged constitutional error, the inquiry under subparagraph (B)(ii) excludes any

consideration of evidence not rooted in constitutional error at trial. As the Supreme Court

put it in discussing a claim of actual innocence before AEDPA, "[the newly discovered]

evidence must *bear upon* the constitutionality of the applicant's detention; the existence

merely of newly discovered evidence relevant to the guilt of a state prisoner is not a

ground for relief on federal habeas corpus." *Herrera v. Collins*, 506 U.S. 390, 400 (1993)

(emphasis added; other emphasis omitted) (internal quotation omitted); *see also* 2 Hertz

& Liebman, § 28.3[e], at 1629 n.149 (reading *Calderon*, 523 U.S. at 558, to suggest that

the Court was contrasting § 2244(b)(2)(B) "with the more expansive range of facts upon

which a petitioner can draw in showing a 'miscarriage of justice' under the Court's" prior jurisprudence).

We find further support for that conclusion by comparing AEDPA's requirement for successive petitions filed by federal prisoners found in § 2255(h). Section 2255(h) is applicable to federal prisoners, who, much like state prisoners, are prohibited from bringing second or successive petitions unless they satisfy the provisions of § 2255(h). As relevant here, § 2255(h)(1) permits a successive petition if the petitioner puts forward "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1).

Although some courts have called these two provisions "materially identical" and have interpreted them in parallel, *see United States v. MacDonald*, 641 F.3d 596, 610 (4th Cir. 2011) (quoting *In re Dean*, 341 F.3d 1247, 1249 n.4 (11th Cir. 2003)), that treatment glosses over critical linguistic distinctions between subparagraph (B)(ii) and § 2255(h)(1). The provisions are different in at least two ways. First, § 2255(h)(1) refers to "newly discovered evidence," whereas subparagraph (B)(ii) refers to "the facts underlying the claim." And second, § 2255(h)(1) omits the phrase "but for constitutional error," which appears in subparagraph (B)(ii).

These differences are crucial. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and

34

different language in another, the court assumes different meanings were intended.")
(quoting 2A Norman J. Singer, *Statutes and Statutory Construction* § 46:06, at 194 (6th
rev. ed. 2000)) (internal quotation marks omitted)). Section 2255(h)(1) can be read to
allow "newly discovered evidence" to "establish" a petitioner's innocence and omits any
requirement that the new evidence be rooted in constitutional error at trial. By contrast,
subparagraph (B)(ii) requires the "*facts underlying the claim*" to "establish" a petitioner's
innocence, and requires those facts to be attributable to some "constitutional error" in the
underlying trial proceedings.

There is good reason to think that these linguistic differences reflect purposeful
action, and are not simply the product of indifferent drafting. Sections 2255(h)(1) and
subparagraph (B)(ii) both govern successive collateral attacks, but they pertain to
challenges on two different types of proceedings: federal criminal trials and state criminal
trials, respectively. Reflecting AEDPA's regulation of federal review of state
convictions, § 2244(b)(2)(B) imposes a strict standard restricting the kinds of evidence
that federal courts may consider when entertaining a state prisoner's successive-petition
claim. And many states have collateral review procedures to evaluate new evidence
unconnected to trial error. *See, e.g., Montoya v. Ulibarri*, 163 P.3d 476 (N.M. 2007)
(recognizing defendant's right to assert free-standing claim of actual innocence based on
new evidence). By contrast, § 2255(h)(1), governing federal court review of federal
convictions, is more lenient. This makes sense in light of "AEDPA's goal of promoting
comity, finality, and federalism," as well as respect for state-court judgments. *Cullen v.*

35

*Pinholster*, 131 S. Ct. 1388, 1401 (2011) (quoting *Jimenez v. Quarterman*, 555 U.S. 113, 121 (2009)) (internal quotation marks omitted); *see also Calderon,* 523 U.S. at 558 ("Section 2244(b) . . . is grounded in respect for the finality of criminal judgments."). Perhaps not coincidentally, these were the same concerns at work in *Sawyer* when the Supreme Court adopted the actual innocence standard that later made its way into § 2244(b)(2)(B)(ii). *See Sawyer*, 505 U.S. at 338, 345.

The distinction makes even more sense in a case such as this, where the state courts have already passed on an applicant's claim of innocence and were not restricted to evidence of innocence rooted in trial-related constitutional error.[6] *See Pinholster*, 131 S. Ct. at 1401 (noting that AEDPA's policies are furthered when state courts have "the first opportunity to review [a] claim, and to correct any constitutional violation in the first instance") (alteration in original) (quoting *Jimenez*, 555 U.S. at 121) (internal quotation marks omitted). Thus, by design, the actual-innocence gateway is narrower for successive applicants seeking to overturn state court convictions than it is for petitioners challenging federal convictions.

It is also worth noting the difference between this case and other types of

---

[6] For example, in this case in state court, the New Mexico Supreme Court acknowledged its recent recognition that "a free-standing claim of actual innocence entitled a defendant to habeas corpus relief under [state law], if the petitioner proved 'by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence.'" *Case III*, 183 P.3d at 909 (quoting *Montoya v. Ulibarri*, 163 P.3d 476 (N.M. 2007)). And in Case's petition in state court, the New Mexico Supreme Court reviewed the newly developed evidence (including recanted testimony and DNA) as part of its evaluation of whether Case merited a new trial.

36

innocence cases. One type of innocence case involves free-standing claims of actual

innocence even if the "conviction and sentence were entirely fair and error free." *Schlup*

*v. Delo*, 513 U.S. 298,314 (1995) (citing *Herrera*, 506 U.S. at 419). Nonetheless, in

*Herrera*, the Court refused to endorse this type of habeas claim, and, as yet, it is an open

question whether such a federal right exists. *District Attorney's Office for Third Judicial*

*Dist. v. Osborne*, 557 U.S. 52, 71–72 (2009).[7] But, as mentioned above, many states,

including New Mexico, allow such claims of actual innocence.

A second type of actual innocence case arises from constitutional claims

procedurally defaulted in state court that have never been evaluated by a state or federal

court. *See Schlup*, 513 U.S. at 314–15; *House v. Bell*, 547 U.S. 518 (2006). In those

cases, the Court concluded that a procedurally defaulted claim could be resurrected in

federal court if a petitioner could pass through the *Schlup*/*House* gateway—namely that

the petitioner, in light of new evidence, establishes it was more likely than not that no

reasonable juror would have found the petitioner guilty beyond a reasonable doubt.

*House*, 547 U.S. at 536–37. If such a showing is successful, it allows the petitioner to

raise a defaulted claim in federal court for initial consideration.

The *Schlup* standard appears to be more forgiving than subparagraph (B)(ii), since

it allows a broader range of evidence to be evaluated by the court—old and new;

---

[7] Case has not raised a free-standing actual innocence claim, but only a successive habeas application under § 2244 alleging constitutional *Brady* error at trial.

admissible and inadmissible—but that is natural.[8]  In those types of cases, the petitioner

faced a procedural default and has yet to have an initial claim of constitutional error

evaluated by a court.  As the Supreme Court explained in *House*, "[d]ismissal of a first

federal habeas petition is a particularly serious matter."  547 U.S. at 539 (internal

quotation omitted).  Here we have no procedural default.

But it is by no means easy for a petitioner to meet the *Schlup* standard.  A

petitioner invoking *Schlup* may "obtain review of [the merits of] his constitutional claims

only if he falls within the narrow class of cases . . . implicating a fundamental miscarriage

of justice."  513 U.S. at 314–15 (internal quotation omitted).  Further, a *Schlup* claim

"does not by itself provide a basis for relief."  *Id.* at 315.  Instead, the success of a *Schlup*

claim depends entirely on the validity of the underlying constitutional claim.  *Id.*  A

*Schlup* claim of innocence is thus "not itself a constitutional claim, but instead a gateway

through which a habeas petitioner must pass to have his otherwise barred constitutional

claim considered on the merits."  *Id.* (quoting *Herrera*, 506 U.S. at 404).

As mentioned above, the Supreme Court recognizes a difference between

---

[8]  *Schlup* requires the habeas court to

> make its determination concerning the petitioner's
> innocence "in light of all of the evidence, including that
> alleged to have been illegally admitted (but with due
> regard to any unreliability of it) and evidence tenably
> claimed to have been wrongly excluded or to have
> become available only after the trial."

513 U.S. at 327–28 (quoting Judge Henry J. Friendly, *Is Innocence Irrelevant?
Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 160 (1970)).

*Schlup/House* claims and claims under subparagraph (B)(ii).  As it said in *House*,

rejecting an argument that AEDPA superseded the *Schlup* standard, § 2244(b)(2)(B)(ii)

does not "address[] the type of petition at issue here—a first federal habeas petition

seeking consideration of defaulted claims based on a showing of actual innocence.  Thus,

the standard of review in these provisions is inapplicable."  547 U.S. at 539.  In short,

*Schlup* and *House* provide little guidance here since they dealt with procedurally

defaulted habeas claims, which are evaluated under a different standard than successive

habeas petitions.  *See* 513 U.S. at 306.[9]

As for what to do with truly "new" evidence of actual innocence—e.g., evidence

that is not linked to constitutional error at trial—the Supreme Court's original jurisdiction

provides an answer.  Even if a freestanding *Herrera* claim were recognized but barred by

§ 2244(b)(2)(B)(ii), another path remains.  For example, in *In re Davis*, 565 F.3d 810,

823 (11th Cir. 2009) (*Davis I*), the Eleventh Circuit held that a freestanding innocence

claim under the Supreme Court's decision in *Herrera* cannot be brought in a successive

petition governed by § 2244(b)(2)(B)(ii).  *See* 565 F.3d at 823–24; *see also Herrera*, 506

U.S. at 400–01 ("[F]ederal habeas courts sit to ensure that individuals are not imprisoned

---

[9] The Fourth Circuit's analysis in *MacDonald* is not to the contrary.  641
F.3d at 609–10.  *MacDonald* compared the language in subparagraph (B)(ii) with
the language in § 2255(h)(1) and concluded these provisions were "materially
identical."  As discussed, *MacDonald* glossed over important differences between
§ 2255(h)(1) and subparagraph (B)(ii), particularly the former's reference to "new
evidence" and the latter's reference to the "facts underlying the [constitutional]
claim."  *MacDonald* also ignored the fact that § 2255(h)(1) applies to federal
habeas petitions, which, as we noted, are evaluated under a different standard than
state habeas petitions.

in violation of the Constitution—not to correct errors of fact. . . . Federal courts are not forums in which to relitigate state trials.") (internal quotations and citations omitted). Thus, the court concluded, as we do, that a successive petitioner's claim of innocence must be tethered to a claim of constitutional error in order for the subparagraph (B)(ii) standard to be met. *See id.* at 823 ("§ 2244(b)(2)(B)(ii) requires *both* clear and convincing evidence of actual innocence . . . *as well as* another constitutional violation . . . . It is, in effect, an 'actual innocence plus' standard.").

Even so, *Davis I* concluded a petitioner could still petition the Supreme Court to hear his claim under its original jurisdiction. *Id.* at 826–27. "The Supreme Court has made clear that the habeas corpus statute, even after [] AEDPA . . . continues to allow it to grant a writ of habeas corpus filed pursuant to its original jurisdiction." *Id.* And that is exactly what happened in *Davis*. Once Davis petitioned the Supreme Court based on an actual innocence claim arising from recanted witness testimony, the Court transferred the petition to United States District Court in Georgia, with instructions to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence." *In re Davis*, 130 S. Ct. 1, 1 (2009) (*Davis II*). After a hearing was conducted, the district court found that "executing an innocent person would violate the Eighth Amendment . . . . [but] Davis is not innocent: the evidence produced at the hearing on the merits of Mr. Davis's claim of actual innocence and a complete review of the record in this case does not require the reversal of the jury's judgment." *In re Davis*, No. CV409-130, 2010 WL 3385081, at *61 (S.D. Ga.

40

Aug. 24, 2010) (*Davis III*) (*cert. denied by* 131 S. Ct. 1788 (2011)).[10]

Our opinion here does not suggest that Case should be prevented from presenting truly "new" evidence of his actual innocence to a qualified tribunal. He can and did so in New Mexico state courts, which considered his new evidence.[11] *See Case III*, 183 P.3d at 908. And as discussed above, New Mexico also recognizes a state free-standing actual innocence claim if a petitioner can prove "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 909 (internal quotation omitted). Instead, our conclusions here are merely complying with the requirements of § 2244, which requires a linkage between constitutional error at trial and a potential constitutional violation.

In conclusion, the universe of facts that enter into the subparagraph (B)(ii) analysis consists *only* of evidence presented at the time of trial, adjusted for evidence that would have been admitted or excluded "but for constitutional error" during trial proceedings.

---

[10] Admittedly, we do not suggest this course lightly. We acknowledge that in the last half century, the Supreme Court has entertained original jurisdiction petitions of this type in only a handful of cases other than *Davis*. *See Hayes v. Maryland*, 370 U.S. 931, 931 (1962); *Chaapel v. Cochran*, 369 U.S. 869 (1962); *see also* Lee Kovarsky, *Original Habeas Redux*, 97 Va. L. Rev. 61, 62–63 (2011). In addition, there are extra-judicial avenues open to Case to challenge his sentence, such as executive clemency from the governor of New Mexico. *See* N.M. Const., Art. V, Sec. 6; *see also Sellers v. Ward*, 135 F.3d 1333, 1340 (10th Cir. 1998) (recourse to executive clemency); *Davis II*, 130 S. Ct. at 4 (Scalia, J., dissenting from transfer of habeas corpus petition) (suggesting a similar course of relief).

[11] The New Mexico Supreme Court considered the witness recantations and *Brady* evidence. Although it did not discuss Case's DNA evidence in its opinion, that evidence was before the court. *See* R. Vol. I at 351, 354.

The factual universe does not encompass new facts that became available only after trial and that are not rooted in constitutional errors occurring during trial.[12]

With this understanding, we next apply the relevant evidence to subparagraph (B)(ii)'s remaining requirements.

### c. *"Clear and Convincing Evidence"*

Case presents three forms of new evidence: alleged *Brady* material (the February 3 Bobby Autry interview), DNA evidence, and recantations from two eyewitnesses. But as explained above, we cannot consider the subsequently produced DNA evidence, nor the post-trial witness recantations. Only the Autry interview is rooted in alleged constitutional error at his trial. Accordingly, this evidence, and this evidence alone, will enter into the subparagraph (B)(ii) calculus. To do so, we take the body of evidence produced at trial, add back "evidence allegedly kept from the jury due to [the] alleged

---

[12] We recognize that the Fourth and Eighth Circuits permit courts to consider the entire universe of available evidence at this stage. *See Nooner*, 689 F.3d at 933; *MacDonald*, 641 F.3d at 610. We believe the reasoning employed in those decisions fails to appreciate two important considerations. First, § 2244 is not a form of relief—it is a procedure for determining whether a court may hear a second-or-successive § 2254 petition on its merits. Second, if a court hears a second-or-successive § 2254 petition on its merits, the standards are no different than hearing a first § 2254 petition on its merits. The petitioner must present a claim of error under federal law, and—perhaps AEDPA's most significant deviation from previous law and practice—the state court decision is entitled to significant deference. Under the Fourth and Eighth Circuits' approach, a second-or-successive petitioner can state a "constitutional error," such as a *Brady* claim, and then have it evaluated in light of every bit of evidence presently available (which of course untethers it from a *Brady* claim). If that satisfies § 2244(b)(2)(B)(ii)—meaning that "no reasonable factfinder would have found the [petitioner] guilty"—then the court must go on to § 2254(d) analysis, which (by design) rarely leads to overturning convictions.

*Brady* violation," *Sawyer*, 505 U.S. at 349, and determine whether it is "clear and convincing," "in light of the evidence as a whole," that "no reasonable factfinder would have found [Case] guilty" of Mitchell's rape and murder, *see* 28 U.S.C. § 2244(b)(2)(B)(ii).

It is also important to note that we need not determine at this stage whether the February 3 Autry interview was "suppressed" by the prosecution, or whether it was "material" for the purposes of a *Brady* analysis. *See United States v. Cooper*, 654 F.3d 1104, 1119 (10th Cir. 2011). If such analysis is necessary, it would occur as a part of the merits determination once Case has passed through the § 2244 gateway.

Instead, our task is to look to the evidence the jury heard at trial, augmented by evidence from Mr. Autry's interview on February 3, and then to make "a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 329 (internal quotation marks omitted)); *see also LaFevers*, 238 F.3d at 1267 ("assum[ing]" the existence of a *Brady* violation and concluding that the petitioner could not "demonstrate by clear and convincing evidence that but for the assumed *Brady* . . . violation no reasonable factfinder would have found him guilty of this murder"). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538.

Thus, Case is required to "establish by clear and convincing evidence," that "no reasonable factfinder would have found [him] guilty of the underlying offense," but for

43

the alleged *Brady* violation. 28 U.S.C. § 2244(b)(2)(B)(ii). Case argues that Autry's February 3 statement meets this standard in four ways: (1) it would have supplied Case with an alternate defense theory—that Autry alone was responsible for Mitchell's death; (2) it would have allowed Case to highlight the weaknesses and undermine the investigatory thoroughness of the state's case; (3) Case would not have testified in his own defense; and (4) it would have been valuable impeachment evidence against Autry.

In essence, these arguments are related: if Case could have argued that Autry was the lone killer, then Case never would have concocted a fabricated story about Mitchell's death as an accident, and he could have further highlighted the weaknesses in the state's investigation and case against him. Moreover, this theory would have allowed Case to additionally undermine Autry's credibility on cross-examination. As a result of these arguments, Case urges us to conclude, as the district court did, that the verdict would have been undermined as a result of this counterfactual narrative.

We disagree. Case's arguments do not meet the standard of "clear and convincing evidence" that "no reasonable factfinder would have found [him] guilty of the underlying offense," which would allow him to pass through and satisfy the jurisdictional requirements of the second gate. *See* 28 U.S.C. § 2244(b)(2)(B)(ii).

A key theme running through Case's legal argument is that Autry perjured himself during direct examination at trial. It is important to evaluate this claim because much of Case's argument is linked to it. The January 30 statement established that Autry and

44

Mitchell were "pretty good friends," and that they had spent some time together in December. R., Vol. IV, BA, Jan. 30 Stmt. at 1. In his March 5 statement, Autry indicated that he had "tried making out" with Mitchell at a local business, the Flumes. R., Vol. IV, BA, March 5 Stmt. at 3. According to Autry, he "got her clothes [off] and we was drunk." *Id.* Later Autry was asked, "is this when you tried to have . . . make love . . . or have sexual intercourse with her?" *Id*. at 6. There is no indication in the first statement that Autry ever tried to have sexual intercourse with Mitchell prior to her disappearance—so we believe, and it seems reasonable, that after reading the transcript of the March 5 statement, Case would have been alerted to the fact that Autry had attempted to have a sexual relationship with the victim.

Additionally, during direct examination at trial, the prosecutor asked Autry if he ever had sexual intercourse with Mitchell. Autry replied, "No sir." R., Vol. IV, Trial Tr. at 980. The prosecutor then asked whether Autry had ever *tried* to have sexual intercourse with Mitchell, and Autry answered, "Yes sir." *Id.* During re-direct, the prosecutor asked Autry if Mitchell was an attractive girl, and Autry answered yes. When asked if Mitchell was known to "sleep around," Autry answered that he did not know, but again acknowledged that he had unsuccessfully tried to have intercourse with her. *Id.* at 1031. Case's defense counsel did not cross-examine Autry on these points during either cross-examination or re-cross-examination.

Case now argues that the more detailed account given by Autry during the February 3 statement—whereby he describes in greater detail the December 21 encounter

45

with Mitchell—indicates that he perjured himself on the stand because he had, in fact, had sexual intercourse with Mitchell because he briefly penetrated her. We think Case over-reads the statement. While this encounter goes beyond attempt in the legal sense, Autry's statement overall is consistent with his testimony at trial that he tried to have intercourse with Mitchell but his advances were rebuffed.

This is significant because it bears on Case's argument, since Case makes much of the fact that, in the February 3 statement, Autry stated that he was "teed off" and "mad" after his advances were rebuffed by Mitchell. But the full exchange is much more equivocal:

> Q: Did you get mad?
>
> A: No. I got—I got mad, yeah, but not, not that mad. I said well hell, ain't no great big loss to get turned down by a girl.
>
> Q: You didn't get mad because she wouldn't let you?
> A: Well—anybody'd get mad, but—I don't mean mad like in—like you're gonna do something like that to her. Just get kind of teed off or something.

R., Vol. IV, BA Feb. 3 Stmt. at 16. And again, Case's defense counsel still did not explore, on cross-examination, Autry's March 5 statement discussing his attempted sexual advances, nor his trial testimony that he had tried to have intercourse with Mitchell prior to her disappearance. Additionally, the February 3 statement indicates that there was no lasting animosity between Autry and Mitchell; after she rebuffed him, they both got dressed and went to a party together. Two days later, Mitchell drove around with Autry and another friend. While these details were not necessarily known to Case at trial

46

since they were contained in the February 3 statement, when evaluated in the context of the evidence as a whole, they significantly undercut Case's arguments. In sum, Case's argument that Autry perjured himself during his trial testimony is unpersuasive—let alone enough that no reasonable factfinder would have found him guilty.

This conclusion bears on our analysis in a number of ways—in essence, Case's arguments are all predicated on a finding that the suppression of the February 3 statement left them without key impeachment evidence against Autry. But that is simply not true.

While Case could have argued that Autry was the lone killer prior to New Year's Day, "evidence that another person had a motive to commit the crime for which a defendant is on trial is generally inadmissible, absent direct or circumstantial evidence linking the third person to the crime." *Case III*, 183 P.3d at 920; *see also State v. Rosales*, 94 P.3d 768 (N.M. 2004) (finding that a third person's motive is not admissible unless there is at least some other evidence to connect the third person to the offense). "For *Brady* purposes, exculpatory evidence cannot be purely speculative." *Case III*, 183 P.3d at 920; *see also United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994) ("The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard.").

Case makes a related argument in claiming he would have had little reason to take "the stand to tell [his] far-fetched story" of the events that transpired at Six Mile Dam had he known of Autry's statement. R., Vol. I at 802. It is correct that, in assessing a *Brady* claim, we will consider how *Brady* material "might meaningfully alter a defendant's

47

choices before and during trial . . . [including] whether the defendant should testify."

*United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009).  But as the state points out,

Case's testimony is only "incredible" in the sense that he fabricated a story claiming that

Mitchell's death was an accident.  Aplt. Rep. Br. at 17.  There were multiple other

eyewitnesses who placed Case at Six Mile Dam, and, as detailed above, Case would not

have been able to argue that Autry was the lone killer because such a defense would have

been purely speculative and against the weight of the eyewitness testimony and physical

evidence presented.  Additionally, had Case not testified, the outcome of the trial would

have been the same—that is, the only legitimate defense theory based on the evidence at

trial, the same one as actually presented, was that Worley was solely responsible for

Mitchell's death.

We are also reluctant to discredit Case's trial testimony.  While the February 3

statement could have theoretically made a difference on his decision to testify, he did

testify under oath in his own defense.  He asks us now to totally reject his version of the

facts.  But he placed himself at the scene of the crime, and we place little value in his

present assertion that he was not there.  "Recanting testimony has long been disfavored as

the basis for a claim of innocence.  Appellate courts, even on direct review, look upon

recantations with extreme suspicion."  *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir.

1997) (Kosinski, J., dissenting).  This admonition is even stronger when a perjurious

defendant changes his story twenty years after the fact.  Given this, the February 3

statement would have added little to further Case's defense at trial.

48

With respect to Case's argument that Autry's credibility could have been undermined by the February 3 statement, the trial record is clear that Autry's credibility was already put into question at trial, "not only through an aggressive cross-examination showing prior inconsistent statements, but through character witnesses who testified that Autry had a reputation for untruthfulness." *Case III*, 183 P.3d at 919–20. Thus, the February 3 statement would have been cumulative to the evidence presented at trial, falling far short of the clear and convincing standard. *See also Nuckols v. Gibson*, 233 F.3d 1261, 1267 n.8 (10th Cir. 2000) (finding that when the credibility of a witness "has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial") (internal quotation omitted); *State v. Chavez*, 867 P.2d 1189, 1195 (N.M. 1993).

While it is true suppressed evidence that "significantly enhanc[es] the quality of the impeachment evidence usually will" be probative, the February 3 statement did not have that effect. *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009); *see also United States v. Torres*, 569 F.3d 1277, 1284 (10th Cir. 2009) ("Merely because other impeachment evidence was presented does not [necessarily] mean that additional impeachment evidence is cumulative . . . ."). The prosecution had already presented facts about Autry during direct examination that significantly undermined his credibility; the February 3 statement was merely more of the same.

During direct examination, for example, Autry admitted that he failed a lie detector test after giving a fabricated story about Mitchell's disappearance and was arrested as a

49

suspect in Mitchell's death on that basis. R., Vol. IV, Trial Tr. at 997–98. Then on cross-examination, Case's counsel was more specific, stating that Autry had previously been charged with "First Degree Murder and Criminal Sexual Penetration in the First Degree" in the case, before being offered immunity in exchange for his testimony against Case and the others. *Id.* at 1003–05. Defense counsel then confirmed that Autry's entire January 30 statement was a lie, that Autry was "afraid of being in jail," and, by implication, that Autry would lie again in order to avoid being sent to the penitentiary. *Id.* at 1014, 1026–27. Then on re-direct, the prosecution again brought up Autry's failed attempt at sexual intercourse, and Autry's attraction to Mitchell. *Id.* at 1031. And, once again, Case's counsel failed to follow-up on that line of questioning during his re-cross-examination. Ultimately, defense counsel's entire cross-examination of Autry was aimed at pointing out the inconsistencies in Autry's prior versions of events, undermining his credibility, and trying to paint him as someone with an ax to grind against Case. We fail to see how the February 3 statement would have changed this inquiry. Ultimately the February 3 statement would have "insignificantly impact[ed] the degree of impeachment," and "would have provided only marginal additional support for [the] defense." *Douglas*, 560 F.3d at 1174 (internal quotation omitted).

In sum, we do not believe Autry's February 3 statement, when evaluated in the context of the evidence presented at trial as a whole, meets even the *Brady* materiality standard, which requires only "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 132 S.

50

Ct. 627, 630 (2012) (internal quotation marks omitted).  And if Autry's February 3

statement does not satisfy this lower standard, it certainly does not satisfy

§ 2244(b)(2)(B)(ii)'s call for "clear and convincing evidence" such that "no reasonable

factfinder would have found [Case] guilty" of the rape and murder of Nancy Mitchell.

Accordingly, Case has failed to pass through the second § 2244 gateway, which would

allow us to consider the merits of his application.[13]

Although a matter for another day given this disposition, we acknowledge the

foregoing approach raises questions regarding what a merits analysis would look like

where the § 2244(b)(2)(B)(ii) standard has been legitimately satisfied.[14]  But because we

find that Case fails the § 2244(b)(2)(B)(ii) standard, we need not explore the analysis

---

[13] Working from our decision in *Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001) (en banc), Case argues in the alternative that applying § 2244(b)(2)(B) to him is an impermissible retroactive application of AEDPA given that he filed his first federal habeas petition before AEDPA.  Assuming *arguendo* we agreed with Case's interpretation of *Daniels*, it would simply require us to perform a traditional *Brady* analysis at this stage.  As already discussed, Case would fail at least the *Brady* materiality test.  We therefore need not reach *Daniels* or the remaining *Brady* elements.

[14] The district court determined at the gate-keeping stage that Case demonstrated a *Brady* violation and then as to the merits, "[r]ather than repeat[ing] its analysis," it "simply refer[red]" back to the prior portion of its opinion, "wherein it fully evaluated Mr. Case's *Brady* claim."  *Case IV*, 773 F. Supp. 2d at 1148.  This approach was analytically incorrect in that it treated the gate-keeping and merits analyses as identical.  Further, even if a full *Brady* analysis had been appropriate at the gate-keeping phase, the district court erred in considering post-trial witness recantations.  *See id.* at 1147–48.  *Brady* "requires a prosecutor to disclose material exculpatory evidence to the defendant before trial."  *Osborne*, 557 U.S. at 68.  A post-trial recantation does not exist before trial, and a prosecutor cannot make a pre-trial disclosure of evidence that does not yet exist.

51

appropriate at the merits stage.

### *3. Non-Brady Additional Evidence*

While we find § 2244 does not require an evaluation of evidence not linked to a trial-based constitutional violation, even if we were to consider the DNA evidence and other witness recantations, alongside Autry's February 3 statement, we would still not find subparagraph (B)(ii) had been satisfied.

First of all, the DNA evidence presented at the state evidentiary hearing fails to be compelling. The more sophisticated testing revealed no evidence of male DNA or sperm cells; this evidence is neither incriminating nor exonerating. While Case argues that, had a rape occurred, some male DNA would be present, there was no definitive DNA evidence presented at the original trial to support the rape conviction. Further, the uncontested physical evidence presented at trial supported an attack of a sexual nature—Mitchell's torn and inside-out clothing and physical injuries. The DNA evidence developed in 2005 is similarly inconclusive, not a "smoking gun" that exonerates Case from participation in the attack.

As to the recanted testimony, we agree with the well-developed analysis of the New Mexico Supreme Court: it was no more than efforts to revert to the original statements Knight and Dunlap gave to the police that they did not know anything about the events leading to Nancy Mitchell's death. *Case III*, 183 P.3d at 917. The fact that Dunlap received immunity for his testimony was presented to the jury at trial. Both witnesses were vigorously cross-examined and admitted in front of the jury that they had

52

lied to the police.  Moreover, Knight admitted

that she had falsely accused Randy Davis of being one of the attackers.  And as we noted

above, recanted testimony is notoriously unreliable, "easy to find but difficult to confirm

or refute: witnesses forget, witnesses disappear, witnesses with personal motives change

their stories many times, before and after trial."  *Carriger*, 132 F.3d at 483; *cf. Davis I*,

565 F.3d at 825 ("[W]e repeatedly have noted that recantations are viewed with extreme

suspicion by the courts . . .  because . . . recantation testimony upsets society's interest in

the finality of convictions, is very often unreliable and given for suspect motives, and

most often serves merely to impeach cumulative evidence rather than to undermine

confidence in the accuracy of the conviction.") (internal quotation omitted).

In addition, Autry's eyewitness testimony at trial corroborated many of the

circumstances of the murder which, though certainly not identical to the other witnesses,

were highly similar.  Case also corroborated portions of the other witnesses' statements

by placing himself at the scene and describing Mitchell being hit by the other men.  Also,

the testimony of the pathologist as to the cause of death—a blow to the head leading to

unconsciousness and death by exposure—was also corroborative of parts of the testimony

by Case and Autry.  The pathologist also testified that Mitchell's hands, the top of her

feet, and front lower torso had scrape marks consistent with the body being dragged,

which was inconsistent with an accidental fall.

In sum, even viewing the evidence unrelated to the *Brady* violation, we cannot

conclude that it rises to a level sufficient to meet the gate-keeping requirements of §

2244(b)(2)(B)(ii).

# III.  Conclusion

Based on the foregoing analysis, we VACATE the district court's conditional grant of habeas corpus, and remand for the court to DISMISS for lack of jurisdiction.

I agree with the result the majority reaches - Petitioner-Appellant Carl Case is not entitled to federal habeas relief. I write separately to express my frustration at the process by which we have made that determination. The majority notes that a state prisoner such as Case must pass through dual gateways before a federal court can consider the merits of his habeas claim asserted in a second or successive 28 U.S.C. § 2254 petition. In truth, we have required Case to pass through a three-part jurisdictional gauntlet.

Initially, this court, acting pursuant to 28 U.S.C. § 2244(b)(3)(C), authorized Case to pursue his Brady[1] claim in a second § 2254 petition, after determining that Case had made a prima facie showing that he could meet the procedural requirements set forth in § 2244(b)(2)(B). That determination gave the district court jurisdiction to consider Case's second § 2254 petition. See Burton v. Stewart, 549 U.S. 147, 149, 157 (2007) (per curiam). The district court, in turn, properly addressed whether Case had actually met § 2244(b)(2)(B)'s requirements. See 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.") A district court "may not consider the merits of the claims alleged in the petition until" that court determines that the "application clears the hurdles erected by § 2244(b)." Brian R. Means, Federal Habeas Manual, 1049 (2012). In this case, after determining that Case had in fact cleared those procedural hurdles, the district

_____

[1] Brady v. Maryland, 373 U.S. 83 (1963).

1

court expended significant effort and resources addressing the merits of Case's claim for habeas relief. On appeal from that decision, we have again reviewed de novo whether federal courts can consider the merits of Case's habeas claim.

This duplicative expenditure of judicial resources runs counter to the purposes underlying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Congress enacted AEDPA, not only to afford the appropriate respect for the finality of state court proceedings, but also with the intent to conserve judicial resources and to streamline the federal habeas process state prisoners can invoke to challenge those state proceedings. See Panetti v. Quarterman, 551 U.S. 930, 945-46 (2007). Addressing at least three times, in two different courts, the question of whether a state prisoner can meet the procedural requirements for asserting a second or successive habeas petition runs counter to those congressional interests in expediency. That is particularly true when both this court, albeit quickly and tentatively, and the district court, more conclusively, have determined that Case can meet those requirements and the district court has, therefore, gone forward with an extensive analysis of his constitutional claim for § 2254 relief.

I acknowledge that this court has once previously provided for this third occasion for review before moving on to consider the merits of a state prisoner's habeas claim, although without first discussing whether we should do so. See Ochoa v. Workman, 669 F.3d 1130, 1140-43 (10th Cir.) (upholding district court's determination that the state prisoner met § 2244(b)(2)(A)'s procedural requirements), cert. denied, 133 S. Ct. 321 (2012). Nevertheless, at some point, this redundant, extensive and resource-intensive

2

consideration of § 2244(b)(2)'s procedural requirements must cease, and federal courts should turn to the merits of the state prisoner's habeas claim. That time, for me, would be here and now. I conclude, reaching the merits, that Case is not entitled to habeas relief on his Brady claim.

That being said, I agree with the majority's analysis of § 2244(b)(2)(B)'s procedural requirements, with one minor exception. Although § 2244(b)(2)(B)(ii) restricts our consideration of new evidence of a state prisoner's innocence to evidence that is directly linked to the constitutional claim he seeks to raise in his second or successive habeas petition, this represents a change from pre-AEDPA law. Before AEDPA, courts applying the actual-innocence exception to most procedural bars, see Sawyer v. Whitley, 505 U.S. 333, 338-39 (1992), considered all the evidence a state prisoner could muster in support of his claim that he was factually innocent of the crime for which he was convicted. See Schlup v. Delo, 513 U.S. 298, 327-28 (1995); Kuhlmann v. Wilson, 477 U.S. 436, 454 n.17 (1986). Therefore, I would not rely on pre-AEDPA case law (including Sawyer, 505 U.S. 333, as well as McCleskey v. Zant, 499 U.S. 467 (1991), and Smith v. Murray, 477 U.S. 527 (1986)) to support our conclusion that § 2244(b)(2)(B)(ii) restricts us to considering only new evidence that is directly linked to the state prisoner's current habeas claim.

3